13310

STATE v. O'SHIELDS

(161 S. E., 692.)

*Messrs. Hendersons & Sally,* for appellant,

410

*Messrs. B. D. Carter, Solicitor, Gunter & Wilder* and *John E. Stansfield,* for the State.

December 19, 1931.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

On August 14, 1930, Ernest Hillman, a young man about nineteen years of age, was stabbed and cut with a knife, from the effects of which he died a few days afterwards. The cutting took place at or near the home of the deceased at Bath, in Aiken County. The appellant, Ernest Malt O'Shields, and his son, Richard O'Shields, a boy about eighteen years old, were charged with the homicide and were tried at the October, 1930, term of Court of general sessions for Aiken County, the Honorable T. S. Sease presiding. The indictment contained two counts. By the first, both defendants were charged, as principals, with the murder of Hillman; by the second, Richard O'Shields was charged with the murder, and Malt O'Shields with being an accessory before the fact. The jury found them both guilty of manslaughter on the first count. Counsel for Malt O'-Shield then moved the Court, on behalf of that defendant, "to direct a verdict of not guilty as to him, or to grant him a new trial." The Court overruled the motion and sentenced each of the defendants to imprisonment for a period of six years. Ernest Malt O'Shields alone appeals, and, by several exceptions, assigns error to the trial Judge in charging the jury; in reading to them from Ruling Case Law—as a part of his charge—as to who are principals and what is meant

by being present, aiding and abetting; and refusing to grant appellant's motion for a directed verdict or for a new trial made after the verdict of manslaughter was rendered." These we shall now consider in order.

The trial Court instructed the jury as follows:

"Now, there can be no accessory before the fact to the crime of manslaughter, but a person may be guilty of accessory before the fact in a felony such as murder, or grand larceny. *As I conceive it, manslaughter is not considered a felony in this State.* (Italics added).

The appellant complains of the italicized portion of this charge as being error, for the reason that "under the law of this State manslaughter is a felony and such a charge was harmful and prejudicial to the defendant, because the jury would be more inclined to convict one of a crime of lesser degree than a felony and one that carries with it less odium, than they would when the crime is a felony or of a more serious nature."

It is to be noted that, a moment before he made the charge objected to, the trial Judge told the jury that a person could be found guilty as an accessory before the fact "in a felony such as murder, or grand larceny," but not to the crime of manslaughter; and it may be that he based his conception that manslaughter is not considered a felony in this State on that fact. That, however, is not the true reason for the rule that one cannot be convicted of being an accessory before the fact to manslaughter. The real reason lies in the nature of the crime. Manslaughter can be committed only where there is no premeditation; it follows, therefore, that a person cannot be convicted as an accessory before the fact for *procuring another* to commit such crime, regardless of its classification.

Blackstone says that the term "felony" is thought to be derived from the word "fee," signifying the fief, feud, or beneficiary estate, and "lon," which signifies price or value, as being a crime punishable by the loss of the fee which the

feudal tenant held of his lord. 4 Blackstone Commentaries, page 95.

In 8 R. C. L., 55, the writer, in speaking of felony and misdemeanor, says:

"Felony, as a term, is incapable of any satisfactory definition, and is descriptive of no offense. At common law felonies were crimes which, like treason, worked a forfeiture of the offender's lands or goods. If this test were applied, there would be no felonies at the present time, for forfeitures no longer follow conviction."

In *State v. Murphy*, 17 R. I., 698, 24 A., 473, 474, 16 L. R. A., 550, the Court, in commenting upon the common-law definition of felony, had this to say:

"Of course, it is to be borne in mind that this definition of felony is mainly historical, and shows what it *was* several centuries ago, while it conveys only a faint conception of what it is now. In fact, there is not, nor ever was, practically any such thing as felony in the United States. For while we speak of certain crimes, such as larceny, robbery, burglary, rape, arson, murder, etc., as felonies, yet it is mainly because we have been taught that at the common law they are so denominated. But when we come to apply the ancient English test of felony, as set forth in the above definition, we find that there is not, strictly speaking, any such crime known to our law. Indeed, the rigor of the common law itself has been so far modified by statute in England that there now remains but very few of the characteristics of the ancient crime of felony. The change in the form of the indictment, however, has not kept pace with the change in the consequences of the crime, so that it is still necessary to allege in all of those cases where the crime was a felony at the common law, and where the statute has not provided what should constitute the offense, or prescribe a form of indictment, that it was done 'feloniously.' "

Aside from treason, a crime is either a felony or a misdemeanor, the word "misdemeanor" being applied to any of-

fense less than a felony; and in most jurisdictions crimes which were classed as felonies at common law remained felonies, while other crimes have been made felonies by statute. The State, in the case at bar, does not deny that the crime of manslaughter was a felony at common law, but does not concede that it is so regarded in this jurisdiction. We have not been cited, however, to any statute changing its common-law classification, or any decision of this Court holding that it is not a felony. On the contrary, the decisions cited apparently support the contention that it is regarded as a felony in this State.

But the fact that a crime is classified as a felony does not necessarily fix it as infamous. A conviction of the crime of manslaughter does not disqualify one as a witness. *State v. Laboon,* 107 S. C., 275, 92 S. E., 622, L. R. A., 1917-F, 896. On the other hand, a conviction of petit larceny is of the *crimen falsi,* rendering a witness incompetent to testify. *State v. James,* 15 S. C., 233. It is seen, therefore, that a greater odium attaches to petit larceny, which carries slight punishment, than to manslaughter, which carries punishment by imprisonment from two to thirty years.

While we conclude that the trial Judge was wrong in stating to the jury that manslaughter is not a felony in this State, we do not think any harm was done. He instructed them fully, telling them that a conviction of that crime carries punishment by imprisonment, in the discretion of the Court, from two to thirty years. He also told them that a conviction of murder would carry sentence of death by electrocution, and that such conviction, with recommendation to the mercy of the Court, would fix the punishment at life imprisonment. Under these instructions, we think that the jury, composed of men seeking the truth, felt that, under the facts and circumstances disclosed by the evidence, a conviction of manslaughter, carrying the lesser penalty, would be the correct verdict.

In charging the jury with regard to the subject of ■ "reasonable doubt," the trial Judge told them that it is not a flimsy or fanciful doubt, but is a "reasonable doubt arising out of the testimony." The appellant contends that the Court committed error in not adding "or arising out of the lack of testimony, or lack of evidence," for the reason that a reasonable doubt may arise out of a lack of evidence as well as out of the evidence itself, and it was harmful to the defendant not to so charge.

In the case of *State v. Abercrombie,* 156 S. C., 375, 153 S. E., 344, 345, this question was passed upon, the same contention being made there as here. The Court said:

"The appellant also complains that the Court erred in instructing the jury as to a 'reasonable doubt.' In this connection, the trial Judge charged that the burden of proof is on the State, and that before a conviction can be had the guilt of defendant must be shown beyond a reasonable doubt, and added: 'And the grounds of that doubt must be found in the evidence that is adduced in the trial of the case.' The appellant urges that this was error, for the reason that a reasonable doubt may arise, not only from the evidence adduced, but from a want of evidence, and that the Court's charge excluded all reasonable doubts that may have arisen from the lack of evidence. No decision of this Court is cited to support this contention, but our investigation leads to the conclusion that it is supported by the greater weight of authority."

It appears that this Court was of opinion that the trial Judge should have charged as contended for by the appellant; but held that the failure to do so, if error, was rendered harmless when all that was said with regard to reasonable doubt was considered. In that case, the trial Court told the jury, among other things, that the law presumed every man charged with a crime to be innocent; "and that such 'presumption remains with him until it is removed by evidence to the satisfaction of the trial jury beyond all reasonable doubt.' "

In the case at bar, Judge Sease told the jury that the burden was on the State to prove the defendant's guilt beyond a reasonable doubt, that no conviction could be had unless such proof was made, and explained to them fully the meaning of the term "reasonable doubt." He further instructed them that the "defendants come into Court clothed with the presumption of innocence, and this presumption of innocence belongs to them and accompanies them at every stage of the trial until it has been overcome by proof." As in the *Abercrombie case,* this charge clearly "indicated to the jury that, if there was a lack of evidence the presumption of defendant's innocence would not be removed, and that a reasonable doubt of his guilt would arise," and if there was error, it was harmless.

In charging the jury as to "cooling time," the trial Judge made the following statement:

"Now, you understand that cooling time does not refer to self-defense. The defense of cooling time is to guide you if you come to the conclusion that the defendant is guilty of murder or manslaughter."

It is contended that this was not only an error of law, "but was also a charge on the facts and prevented the jury from considering whether or not the defendants, while smarting under the provocation they had received, used more force than was necessary, or pursued the adversary too far; and though acting in self-defense, under sudden heat and passion, whether they had sufficient cooling time as ordinary human beings to realize the danger was over and that they should withdraw from the conflict."

This contention is without merit. The principle of "cooling time," as it is called, may be properly considered by the jury in determining whether one charged with homicide is guilty of murder or manslaughter. One may take the life of another under circumstances of legal provocation, or at a time when passions have been aroused and reason has lost its sway, and the crime, by operation of law, will then be reduced from murder to manslaughter. However, if suf-

ficient time has elapsed, under all the circumstances of the case, for the accused party to cool, that is to say, time within which an ordinary man, under like circumstances, would have cooled, before the fatal blow is struck, then the killing would be murder.

In the case at bar the defendants pleaded self-defense, and the appellant, as a further defense, also claimed he was not present when the deceased received the fatal wound. It was admitted that an altercation took place at the home of the appellant between him and the deceased; that thereafter the deceased fled, but was pursued by the defendant, Richard O'Shields, if not by the appellant himself. It is clear that, if the appellant had killed the deceased in self-defense when first assaulted, he could have availed himself of that plea; but if he did not then kill him, but the deceased fled and was overtaken and slain by the appellant, he could not claim self-defense by reason of the fact that sufficient time had not elapsed for cooling. To hold otherwise, would be to eliminate from the law of self-defense the principle of necessity out of which it arises, and upon which to be meritorious the plea must rest.

It seems to be clear, from the jury's verdict, that they took this principle of "cooling time" into consideration in its applicability to the evidence before them and gave to the defendants the full benefit of it. There is nothing in the charge of the Court with respect to this question about which the appellant can complain.

The trial Judge, in instructing the jury as to what would constitute a person a principal in a crime with another who commits the act, read to them Sections 12 and 13 of Volume 1 of Ruling Case Law, at page 138. It is contended that this was error, for the reason that much that is contained in the sections read refers to cases of conspiracy to commit a crime "when there was no evidence of any conspiracy in this case"—in other words, that the Court, in reading from

Ruling Case Law, charged law that was not applicable under the testimony in this case.

We have read carefully the entire charge of the Court, and especially that portion of it here complained of. While, perhaps, it is not always best for the trial Judge, in instructing the jury, to read to them at length from the lawbooks, for the reason that he may thereby inadvertently instruct them as to law that is not applicable to the case as made by the evidence, we do not think that there was any such error in the present case. It must be conceded that what was read by the Court contains sound principles of law, clearly stated; and, while we do not deem it necessary at this point to review the testimony, we are satisfied that under the evidence there was no reversible error. The Court was careful to impress upon the minds of the jury that, before they could find the appellant guilty as a principal, they must satisfy themselves beyond a reasonable doubt that he was present, either actually or constructively, aiding and abetting the actual slayer, and encouraging the commission of the act which resulted in the death of the deceased.

Appellant's motion, made after conviction, "to direct a verdict of not guilty as to him, or to grant him a new trial," was based on the following grounds:

"That under the testimony in this case the defendant, Ernest Malt O'Shields could not be convicted of manslaughter, and the undisputed testimony does not warrant a verdict and will not support a verdict of manslaughter against him, because the uncontradicted testimony shows that he was not present, aiding and abetting the other defendant, Richard Earl O'Shields, to commit the crime which he is alleged to have committed, but on the contrary was several hundred feet away up at the O'Shields' house when the fatal wound was inflicted, and was not present participating in the alleged crime charged in the indictment, and consequently could not be convicted as a principal."

In overruling the motion, the Court said:

"I think there is some testimony from which the jury could conclude that Mr. O'Shields was present in the sense of being present, as I instructed the jury. In this case I read it was one continuous transaction. Mr. O'Shields, according to his contention, is the one that received the provocation. He was cut by one, and struck by the other, he says, and the other boy was on the front porch and in close proximity, and from there on it didn't take those three boys long to get down there, a distance of 248 feet, and Mr. O'Shields was moving around at various times in the house and out on the street all of the time with the knife in his hand, and his appearing so quickly on the actual scene of the cutting, and with a knife in his hand, and still after one of the boys, I believe is sufficient to convince the jury beyond a reasonable doubt that he was there aiding and abetting and participating. I will have to overrule the motion."

It is contended that this was error, for the reason that the "uncontradicted testimony shows that the appellant did not kill the deceased and there was no sufficient testimony to show that appellant was present aiding and abetting the actual slayer, Richard Earl O'Shields, at the time the fatal blow was struck"; but that, on the contrary, the only reasonable inference to be drawn from the evidence is that the appellant had retired and withdrawn from the conflict and was several hundred feet away from the scene of the killing when the fatal wound was inflicted.

The motion for a directed verdict came too late; and counsel for the State now make the point that, as the defendant failed to comply with the requirements of Rule 77 of the Circuit Court, the alleged error in the refusal of Judge Sease to grant him a new trial should not be reviewed on appeal. It is true that appellant did not comply with the rule, but as his liberty is involved, we will waive his failure to do so and consider the question on its merits. *State v. Stevens*, 116 S. C., 210, 107 S. E., 906; *State v. Ray*, 147 S. C., 329, 145 S. E., 192.

A proper disposition of the question here raised requires an examination of the testimony; this we have carefully made. As is usually the case, the evidence is in sharp conflict on all material points. The record discloses that some trouble first arose between the deceased, Ernest Hillman, and the appellant at the home of the latter, where the former, a stepson, was living at the time. Mrs. O'Shields, wife of the appellant and mother of the deceased, testified that her husband struck the first blow, but O'Shields denied this, declaring that Ernest struck him first. Whatever may be the truth as to this, the testimony tended to show that the appellant finally got the deceased down upon a bed and was threatening him with a drawn knife, when Marvin Hillman, a brother of Ernest, came in and succeeded, apparently with the help of others, in getting them separated. Mrs. O'Shields also testified that the appellant told her he had cut himself in the fracas, but he testified that he was cut by Marvin Hillman. The evidence showed that, in the general mix-up, the deceased left the house and ran down the street toward the place a few hundred feet distant from the O'Shields house, where shortly thereafter he was fatally stabbed by Richard O'Shields, the son of the appellant. Just where Malt O'Shields was at the time of the cutting is one of the questions in dispute, counsel for appellant contending that he had turned back and withdrawn from the pursuit, while the State insists that he was still active in the matter up to the time the fatal blow was struck. It is also in dispute whether the appellant told his son, Richard, "go get Pat"—"Pat" being the name by which Ernest was addressed by members of the family—or whether Richard told appellant that he would "catch him," meaning Marvin, when advised by his father of the trouble. In any event, there was testimony tending to show that Richard O'Shields joined in the pursuit, and that the appellant, with a drawn knife, first chased the deceased and then Marvin Hillman, and that Marvin fled, followed by Richard and the appel-

lant, in the general direction in which the deceased had gone; and that Marvin, still closely pursued by appellant, arrived at the scene shortly before the cutting took place. There was other testimony tending to show that the appellant, immediately after the deceased left the house where the trouble started, was seen going in the same direction in which Ernest had gone, and that, although he turned back from the pursuit of one brother or the other at least twice, when admonished to do so, was finally seen going down the back street in the direction of the place where the cutting occurred and, after the cutting, was seen coming from that direction in an automobile.

From this and other testimony in the case, we think that the jury was warranted, under the applicable principles of law charged by the Court, in finding and concluding that the appellant was present, either actually or constructively, aiding and abetting at the time the fatal wound was inflicted. As said by the Circuit Judge, the jury might reasonably have concluded from the testimony adduced that it was a continuous transaction, and that the appellant was active in the matter from the moment the first blow was struck, in the house, until the fatal wound was inflicted by Richard a few hundred feet away, as there was testimony tending to show that, during this time, the appellant directed his son, Richard, what to do in the matter, and was himself busy with a drawn knife in hot pursuit of one brother or the other, until the affair reached its culmination in the fatal stabbing of Ernest Hillman by Richard O'Shields. There was no error on the part of the Court in refusing the motion for a new trial.

All exceptions are overruled, and the judgment of the Circuit Court is affirmed.

MR. CHIEF JUSTICE BLEASE and MESSRS. JUSTICES CARTER and BONHAM concur.

MR. JUSTICE COTHRAN did not participate on account of illness.